This hearing is Moseley v. Yoder, No. 518272. Call the meeting to proceed. Please record, my name is George Ripley, and I'm here representing the plaintiff. We have a rather unusual case today, in that we're not speaking about a jury case, we're talking about a bench trial. And we have a rather unusual plaintiff, in that the plaintiff, on time of the injury, was a board-certified fender practitioner, MD. At the time of the trial, he had just finished another residency in anesthesiology and critical care. It is our position that the court in this matter came to a decision that was not supported by the manifesto of the evidence, as is contrary to the manifesto of the evidence, both on liability, as contributory negligence, and on the medical. And he made several critical errors in his analysis of the facts. He did make a warrant in favor of your client, is that correct? He did. And what was the total amount? $71,000. For all permanent injuries that are going to be lasting for the next 43 years for this young man. And that was a little bit unusual, wasn't it, in that it originally was Judge Lachine. Well, that was a real problem, and I think it was the case in a lot of ways. We tried the case in front of Judge Lachine. He took it under advisement for a considerable amount of time, and then died before making a decision. We then tried the case again on the record in front of Judge McGuinn. Was there any new evidence introduced at that time? No. No, it was on the record. It was on the transcripts of the testimony. There were evidence depositions available as to Ms. Tucker, Ms. Anger, and the three physicians. Whether he watched those or not, that's not clear on the record whether he looked at those at all. Now, Mr. Richinger, you know, you contend that that may have impacted the decision, the outcome of this case or not, because I don't know. I don't have any idea what he considered and what he looked at when coming to his decision. But if you review his depositions and you review his order, which is extensive, several pages of handwritten order, his view of the facts do not mesh with the testimony that the physicians were given. For example, he relied upon an orthopedic surgeon who saw Mr. Mosley one time after four years, and then he was saying that he was not able to give an opinion on causation. Well, that's not exactly difficult to understand. If you look back, he saw him one time four years later. What he did say was that the injury to the shoulder was consistent with having been caused by trauma. And his comments regarding the hip were that they usually are not caused by trauma, but he didn't say it wasn't caused by trauma. Yet we had this testimony, a very unusual plaintiff, who gave his medical history and his problems and his diagnosis, which the average plaintiff isn't likely to give. And I can appreciate that, but you also must appreciate there is more of a concern for bias than you would expect from a witness that had the same training and medical expertise as your client. That's a possibility, certainly. However, if you're going to call a physician and an ambulance officer a liar, that's going to be kind of difficult to understand. And this man was a different in most cases. We have a military person who was seen by any number of doctors because, you know, as he testified, you don't normally see the same doctor. If you look at the medical records, 42 times that he was treated in the military medical system, the records are consistent with the complaints that he has, with the diagnosis that he has, and with the treatment that he has for the conditions that he has. It's simply backed up by the record every time. The complaints are the same. The treatment's the same. And those who see it can tell you that what he has is a permanent condition. The most telling is probably the first doctor that saw him, Dr. Derby, who treated him for a year. Dr. Derby said that it was caused by a trauma, and Dr. Derby not only was his treating physician, but they worked together. Now you're talking about the hip or the shoulder? The wrist, the elbow? Everything that he complained of. Everything was testified to by Dr. Derby. In fact, he gave him two injections of the trochanteric bursa, which is one of the major problems in the hip, and he gave him one injection in his shoulder. So what we had was a shoulder condition that was there and then got worse, and we had a hip condition that was there and pretty much stayed the same. He was getting injections of the trochanteric bursa repeatedly, and then actually when he fell, he found the second problem with the hip. Simply by, well, accident, he had the time to give him a different kind of injection and found that there was a neurological problem at that area as well, and none of them could be treated. All of them were permanent. Dr. Derby said that, based on the reason he gave medical certainty, the conditions that he had could be permanent in nature, and after five years, I'd say that's probably a pretty good idea of what's happening. He still has the shoulder pain. He still has the hip pain. Now the wrist and the elbow, those had gotten much better. Those were not a real problem for him. He was worried about the wrist because of his performing medical care, but it had not become the problem. The problem was the hip and the shoulder. On the shoulder, the doctor who saw him offered him surgery, and he testified he was going to have that when he moved to his next duty station in Alaska. In fact, he has. Can I interrupt you because obviously you feel that the award was inadequate. Yes, ma'am. And leaving aside the CN part of it, what did you project or did you offer any recommendation of an award? I did, but it's in my closing argument, which is in the record. I'm sorry. It's in my closing argument, which is in the record. Okay. It's dramatically higher than $71,000. Which was roughly what it was? It was approximately $1 million, I was suggesting, because of the constant hip and the fact that the hip was not getting any better. He was going to need future medical care, and the judge said that he did not need future medical care because we couldn't present how much that was going to cost. As the court knows, you don't have to project how much it's going to cost. For one thing, he's getting it through the military. It's not actually costing him anything. Whenever the military provides that care, they have to pay it back. Let me interrupt you and ask you about Dr. Roach. Didn't Dr. Roach testify that the 2012 accident was not related to the hip pain? No, sir. What he testified to was that that condition is not usually caused by trauma. That's dramatically different from saying it wasn't caused by the trauma. He never said it wasn't caused by the trauma, and he said that the shoulder injury was consistent with having a form on his left side with an arm outstretched to the left when he hit the ground. Now, neither one of those says specifically that it was caused by the trauma. But again, asking a doctor to come to a causation conclusion based upon one examination, which the examination itself was actually conducted by a resident, not by the doctor who testified, to ask him after one visit to opine as to the causation is asking him off the lot four years later. He did say the shoulder injury was consistent, and he said that usually the hip condition is caused by repetitive trauma, repetitive trauma as opposed to immediate trauma. That's considerably different. What is our standard of review here? Standard of review is, gosh, put it in a big word. It's whether or not we support it by a manifest way to the evidence. So if there's any evidence in the record to support the trial court's findings, then you defer to the findings of the trial court. Not necessarily. When the conclusions of the court are so far off of what the testimony is, I don't believe that you have to defer. When it's clear that everybody said it was either caused by or consistent with the injury, I don't think you can discount a judge's verdict that is contrary to that. And, you know, there's manifest right and there's absolute wrong. And in this case, I think that the judge's conclusions and the basis for those conclusions are contrary to the facts. That's beyond manifest right. That's just wrong. And I don't believe this court should support that kind of error. We're talking about a man who's 31 years old. And his testimony is that this is a constant pain. He can't even do the running that he's required to do by the military. He's got a constant waiver of that because of the injury. Running? Can you explain that? When you're in the military, you have to do a physical test at least twice a year. That amounts to push-ups, at least at that time, push-ups, sit-ups, and a run. Two miles or three miles, depending upon the surface that you're in. I was in the Army for 31 years, and we had to do three miles. And in this case, you can get a waiver of that, and you can either do a bicycle or you can do a walk. In the Air Force, at least. In this situation, he was waived by the physicians in the Air Force, not required to do the run because of his pain. In fact, they wouldn't even let him do the walk half the time. And he testified that this was not a problem for him because the Air Force needed physicians, but it could be a serious problem for the average Air Force personnel. Did he testify as to what impact his injuries had on his ability to function as a doctor? He testified that the shoulder was the kind of thing that could be a problem after use. He testified that the hip was not a problem during the day, but at the end of the day, he was pretty much on his back or sitting down because of the pain. But the use of the hip and the use of the shoulder increased the problems, increased the symptomology. One of the other things he testified to was that he could no longer play with his children. He had five children. He couldn't pick them up. He couldn't spend a long time walking in amusement parks, that type of thing. He just couldn't do it anymore. He couldn't play tennis. He couldn't do the kind of physical activity that he was used to doing. Dr. Derby not only knew him from before, but they served together in Afghanistan shortly before this accident occurred, and he testified that he had no problem with his shoulder or hip at that time. In fact, he was running on a regular basis to fight the boredom of being in Afghanistan. He had only been back about three weeks at the time that this occurred, so Dr. Derby certainly had familiarity with his condition immediately before this collision, and that was part of his ability to say this is what caused it because he knew the man beforehand and shortly beforehand and knew that he didn't have a problem with it. On the other part of what we worried about is the finding of 5% contributory negligence, and I think that's contrary to the manifest way of the evidence as well. But wasn't there anything that witnessed that said that he had been weeping and swerving and weaved left at the time of the accident? Yes, there was, and when the cross-examination, she said that a weaving through the fog on the edge of the road about that far. That's not weaving. That's riding a bicycle, and he had the right to be on that road. I think that witness actually felt that bicycles should be on the road, but that is not a dangerous bicycle ride. That much? Under the law, you're supposed to give bicycles three feet clearance. If she gave him three feet clearance from the fog line, the outside of his weaving, this accident, this collision would not have happened. And about the other thing, if you listen to the particular plaintiffs, I mean, so the defendant's story about what happened, she said that she speeded up to 10 to 20 miles an hour over the speed limit and swerved over all the way to the fog line on the other side of the road and that Doug Mosley turned into her. Now, there's no road there for him to be turning into. He's 150 feet from his home subdivision, and that is totally inconsistent with the two independent witnesses. The one said, Ms. Tucker said that she couldn't have pulled that far because there was oncoming traffic, and Ms. Anger, who was immediately behind her, said that she stayed within her lane of travel and did not move over the center line. Now, those are the independent witnesses. That's what they said. There was in the order, it didn't say that, but in the argument made by opposing counsel, it didn't say that. That's what the testimony was. And how you can find any kind of contributory negligence in that regard, especially with a statute that says you have to give a bicycle three feet clearance when you go around them, what you do when there's oncoming traffic is you slow down until you can go around them. That may not be the way people like to drive, but that's what a safe driver is supposed to do, and a bicyclist has, certainly, has every right to be on the road, and in that space between the fog line and the edge of the road, it's certainly not something that a bicyclist can't do. A bicyclist has the right to be on the road. In fact, there was a gravel shoulder. I don't think anybody would want to ride a bicycle in gravel. That's going to be more dangerous than riding on the road in a lot of ways for the bicyclist because there's a possibility of falling because of the uneven surface. There is simply no testimony except the defendant's and his contract. The two independent witnesses are completely contrary to that testimony. It couldn't have happened. In fact, if she went around it, I don't see how a bicycle could possibly go all the way. If the car had already gone, the defendant got all the way across the road. You're talking about a car going 40 miles an hour and a bicycle maybe going 15 at the most. It doesn't make any sense. It's contrary to the laws of physics, not to mention contrary to the testimony of the two independent witnesses. The fact that one of the independent witnesses is somewhat more difficult because she testified to be in one location at the entrance to the subdivision 150 feet away, and the police report and the policeman's testimony was that she was on the other side of the road in a parking lot for a daycare center behind a three-foot fence. What is your position if you have one? It doesn't make much difference. What she said was he was wheeling between four inches. That's not a negligent bicycle ride. There's a certain amount of wheeling going on just to stay on top of the bicycle. That's not dangerous, but she should have been able to get around him safely. The only reason she hit him was because she was 16 years old and probably a middle school driver, and she panicked, and she hit him basically with a mirror. Almost missed him. But if he's riding between inside that fog line, there's no way she should have been able to hit him, but she did. So how much space is there in between the fog line and the edge of the road? About like that. But that's not where the bicyclists are not required to ride inside the fog line. No. They're supposed to be safely to the right side as possible. And in the same direction as the traffic on the highway, contrary to if you're walking against the traffic. The bicyclists are entitled to be on the road. They're supposed to stay as far to the right as possible, and the automobile drivers, by law, are to pass, give them three feet clearance when they go around them. That just didn't happen here, and it wouldn't even come close. So it's our position that the finding of contributory negligence was not supported, that it is contrary to the manifest way to the evidence, and that the award not only is contrary to the manifest way to the evidence, so are the judge's findings which result in that award, because they're contrary not only to the manifest way to the evidence, they're contrary to the evidence. They're just diametrically contrary to what witnesses testified to.  Afternoon. Good morning, Your Honor. My name is Mike Cerullo. I represent the appellee defendant, Julia Yoder, and I'm in the unique position of asking this court to affirm the judgment in favor of plaintiff in the amount of $71-some-thousand. The court is right that the standard of review is whether or not the judgment entered by the court was against the manifest weight of the evidence, which means is there a basis upon which the court could and did rely in entering the judgment that it did? And the plaintiff appellant is not so much arguing that the judgment is against the manifest weight of the evidence. What I heard was an argument that the court gave improper weight to certain pieces of evidence and favored other pieces of evidence, other portions of testimony. I thought what he said was Dr. Roach did not say that the hip problem was not caused by the accident. And I disagree with that assessment of his testimony. Dr. Roach was asked directly whether or not the hip condition as it existed in 2016, 2017, 2018, not at the time of the accident but now, was consistent with the automobile accident described by the plaintiff. Dr. Roach's answer was consistent, no, generally this is a repetitive use injury. Is that the same as saying that he believed it was not causally related to the accident? I think that is the extent and the effect of his testimony was to say that there was, that the hip injury as it exists at the time of trial is not related to the accident that occurred back in 2012. I believe that that is his clear testimony in this. And that there was some fudge room in terms of the shoulder and whether that could be related. Again, he didn't offer an opinion one way or the other. He said more likely it is a repetitive use but that could be traumatically caused. But I think it's important to note that the court didn't say neither of these injuries from the date of the accident until some point in the future were unrelated to the accident. The court actually compensated the plaintiff for pain and suffering and for medical expenses related to the hip injury and the shoulder injury. The court simply indicated that there was no, and actually the court also gave an award for some because it was unsure the extent to which the shoulder injury and the hip injury at present day were related to the accident. The court thought it could be some. It wasn't sure. There was testimony that went both ways. So there was some award for future pain and suffering related to the hip and related to the shoulder as well. Those were all compensated by the court where we seem to have run into some difficulty as the court found that there wasn't a sufficient basis to award future medical damages. And the rationale that the court had was twofold. The first was there was no indication that the shoulder surgery that was being recommended by Dr. Roach, which seems to be the basis of the request for an award of future medical, there was no indication that that condition was related back to the automobile accident. And the evidence of that is actually quite substantial in this. Not only does Dr. Roach refuse to link the need for surgery in 2016 to the 2012 accident, but the court was presented with the plaintiff's medical records, which were extensive, that show from January of 2013 through October of 2016, a period of three and a half years, the plaintiff made a dozen visits to medical care providers and not once complained about his shoulder. That was all presented to the court. In 2014, the plaintiff filled out a pain diagram where he was supposed to indicate where he was hurting on his body, omitted the shoulder, not included. And during a later physical exam in 2014, he was asked, are you experiencing any limb pain, any muscular pain? And the answer was no. And the court noted that there was a gap, there was a waning of shoulder complaints that gave it pause as to whether or not what was going on in 2016 and this potential need for a labral tear repair was related back to the accident. And there was evidence. And I don't think it's against the manifest weight. In fact, I think that the overwhelming weight of the evidence supports the court's conclusion on that. But that's not the standard that I have to endorse here. All the court needs to affirm the judgment is to simply find that there was some evidence to support that. And the medical history and the testimony of Dr. Roach gets you there. Some evidence which is not overcome by the manifest weight of the other evidence. That's correct. And apparently the manifest weight of the evidence comes from two places in the medical, according to the plaintiff. The first would be the plaintiff himself. And the court is well aware that the trial court was free to give whatever weight it wanted to give to Dr. Mosley, the plaintiff, the plaintiff doctor's testimony in this. And the court gave some. The court also indicated that it looked to Dr. Roach, who is the orthopedic surgeon, the only orthopedist who I should note was designated by the plaintiff as an expert in this case, not by the defense, to provide testimony as a treating expert physician. The other, Dr. Derby, was in no position to provide any testimony concerning the extent and scope of the injuries in 2016, 2017, 2018 at the time of trial. Dr. Derby himself testified that his patient-physician relationship with the plaintiff ended back in 2013. So we've got a whole three-, four-year period where Dr. Derby can't, he can provide testimony in support of the original damages for which the court awarded the plaintiff compensation. He has nothing to offer the trial court as to the extent of the injuries as they exist in 2016, 2017. The only physician who saw the plaintiff during that time frame, the only physician other than the plaintiff was Dr. Roach, who gave the, I think, the clearest, most unbiased testimony. In regard to the specifics, and we don't really get into that in the briefing, but in regard to the specifics, the plaintiff contests the fact that there wasn't an award of future medical for future hip injections. The court properly refused to award any damages for future hip injections because a plaintiff's own pain management doctor testified that he was asked whether or not the hip injections would be required, and the answer was, I'm not certain. He had no idea whether they would be required, the extent, the frequency of those. Likewise, the court did find it notable that the plaintiff did not introduce any testimony concerning the cost or value of the medical treatment, and the plaintiff is correct that a plaintiff is not required, or let me say it a different way, a jury or bench-tribe judgment that awards future medical care does not have to be based on itemized medical cost for future care. The plaintiff is absolutely correct in that we don't contest that. What we contest is it is not automatically error, or a prior effect, to refuse to award speculative future damages in a situation where, one, there's a causation problem, two, there is a lack of testimony concerning the actual need and frequency for that medical treatment, and three, again, whether it would be speculative on the court's part as to what those damages should be. In fact, there is no case that says a court must award, either a bench-tribe case or a jury, must award future medical damages in the absence of value or cost testimony. The cases cited by the plaintiff all go the other way, in which the judgment was upheld where future medical was awarded, and the rationale behind that was the great leeway and the great deference afforded to the trial court or to the jury in determining damages. Under the manifest weight of the evidence standard, it's even higher in terms of awarding damages. The determination of damages is held to be left to the trier effect, and the reviewing court should not rightly substitute its opinion. Here, the court made a very clear determination and explained its rationale for why it was not awarding for future medical care and why the future damages were limited the way they were. There was testimony indicating that the present complaints of hip and shoulder pain were not related at the time of trial and moving into the future. In regard to the 5% apportionment of false contributory negligence against plaintiffs, it is a very minuscule number, in fact, one that I would have expected to be higher, given the amount of testimony in the case. And Mr. Willinger, I think, has already done my job for me in a lot of ways on this point. He has explained to you what Ms. Yoder testified to, the fact that she witnessed the plaintiff on his bicycle swerve into her car. That's when she testified at trial. She testified at trial that she left what she said was a full arm's length, more than three feet, required by the statute. The court rejected that testimony at a rate of 95%. It was discounted. But at the same time, there was testimony supporting that the plaintiff had fault in this matter. Likewise, the court is absolutely correct that there was an independent witness who clearly testified that the plaintiff was weaving and swerving in traffic prior to the accident. Her testimony went further than that. I know that there's some equivocation about how far she was weaving and swerving, and she gave a number that witnesses are sometimes inclined to do that may or may not be accurate. But what she was very clear on was that she believed he was cycling in a dangerous manner, and she also testified that she believed that the plaintiff was going to cause an accident by the way he was cycling. The court didn't like her testimony very much either, again, discounting it at that 95% rate, but it gave some weight to it, as it was entitled to do. The plaintiff is not saying there is no testimony in favor of a contributory fault assessment. Essentially, the plaintiff is asking this court to readjust the weight that's given to the testimony, despite the fact that it has an opportunity to review the testimony of the witnesses involved, except to the extent it was provided in the record. So under this manifest weight of the evidence standard, there certainly is sufficient evidence for an apportionment in this case. In terms of the medical, there is absolutely evidence to support the conclusion that the present complaints of pain at the time of trial and in the future were not related to the accident, and that future medical care would be speculative, such that the court wouldn't have to award any damages for it. So we would ask, if the court has nothing further to report, affirm the trial court's judgment in favor of plaintiff in the amount of $71,000. Thank you. Thank you, counsel. We vote. I alluded earlier to the judge getting it wrong, and I'm just going to mention where he got it wrong. One thing, he said that Dr. Durbey didn't provide an opinion based upon a reasonable degree of medical certainty. Well, that's not required. In fact, he did. He said that he testified that the hip problem was a chronic hip problem. He did not. He said it was traumatic condition, and he diagnosed it as a problem with the bursa, the trochanteric bursa, which has been a consistent diagnosis throughout this by every doctor that's seen him. Dr. Durbey started the hip injections. They continued, and he continued to have them so that because they would wear off after about six months, he continued to have them twice a year. There's absolutely no basis for deciding that he won't need them continuously since his complaints were the same. Also, I think the court should understand that there is no other history in this case. There is a bicycle case, a well, 31-year-old man, and a bicycle collision. That's the only history in this case. Nobody said that there's been any kind of repetitive trauma involved in this case. Nobody said it's caused by repetitive trauma, only that most of the time it is caused by repetitive trauma. Judge McGlynn said that his shoulder injury was minor, and yet Dr. Roach recommended surgery, in fact offered surgery, and surgery is never a minor injury. The reason he didn't have the surgery immediately is because he was in training and didn't want to interfere with that training. That's what Dr. Roach's testimony was. He just got it wrong. Dr. Roach, you saw him, did make the diagnosis of rotator cuff tendinopathy with possible labral lesion and greater trochanteric bursitis in the left hip. It's consistent throughout, and this decision has come through the manifesto. I want to ask you what you request this court to do. I would like to demand to the trial court for a new trial on the issue of damages, in front of a different judge, or a new trial in its entirety. Thank you. Thank you, counsel. The court will take the matter under advisement and issue its decision in due court.